# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**FEDERAL TRADE COMMISSION and**
**STATE OF FLORIDA, OFFICE OF THE**
**ATTORNEY GENERAL, DEPARTMENT**
**OF LEGAL AFFAIRS,**

        **Plaintiffs,**

**v.**                                 **Case No:  6:15-cv-1016-Orl-28KRS**

**ALL US MARKETING LLC, et al.,**

        **Defendants.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

      This cause came on for consideration without oral argument on the following motion filed

herein:

| | |
|---|---|
| **MOTION:** | **PLAINTIFFS' SECOND RENEWED MOTION [FOR] DEFAULT JUDGMENT AND ORDER FOR PERMANENT INJUNCTION AND MONETARY RELIEF AGAINST DEFENDANTS CHRISTIAN SERNA, ALL US MARKETING LLC, AND GRR FINANCIAL SERVICES LLC (Doc. No. 166)** |
| **FILED:** | **January 20, 2017** |

## I.    BACKGROUND.

      This case involves multiple alleged violations of Section 5(a) of the Federal Trade

Commission Act ("FTC Act"), 15 U.S.C. § 45(a); the rules promulgated under the Telemarketing

and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108 ("Telemarketing Act");

and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-213 ("FDUTPA").

On June 22, 2015, Plaintiffs, the Federal Trade Commission ("FTC") and the State of Florida ("State"), filed a complaint against thirteen Defendants, including All Us Marketing LLC ("All US Marketing"). Doc. No. 1. On the same day, the Court entered a Temporary Restraining Order with asset freeze, the appointment of a receiver, and other equitable relief, and ordered all Defendants to show cause why the Court should not enter a preliminary injunction against them pending a final ruling on the complaint. Doc. No. 28. All Us Marketing did not appear at the preliminary injunction hearing, and the Court thus entered a preliminary injunction against it on July 7, 2015. Doc. No. 58.

On October 6, 2015, Plaintiffs filed an amended complaint, adding five new defendants, including GRR Financial Services LLC ("GRR Financial") and Christian Serna ("Serna"). Doc. No. 87. Clerk's defaults were subsequently entered against All Us Marketing, GRR Financial, and Serna (the "Defaulted Defendants"). Doc Nos. 115, 117, 120. Final judgments have been entered against the remaining Defendants. Doc. Nos. 131-136, 154.

Plaintiffs have moved for default judgment several times before. Doc. Nos. 130, 146, 151, 155. All of those motions have been denied without prejudice or withdrawn. Doc. Nos. 141, 150, 152, 157. Most recently, I denied Plaintiffs' motion for default judgment because it was unclear whether the Defaulted Defendants had been properly served and, thus, whether the defaults entered against them had been improvidently granted. Doc. Nos. 156, 157. After that motion was denied, Plaintiffs filed updated proofs of service showing that All Us Marketing and Serna had been properly served. Doc. No. 158. It also became clear that the default against GRR Financial had been improvidently granted, and I vacated that default. Doc. No. 159. After that default was vacated, Plaintiffs re-served GRR Financial with a copy of the summons and amended complaint by making

service on its registered agent.   Doc. No. 161.   GRR Financial failed to answer, and, following a motion from Plaintiffs, the Clerk issued a new default against it.   Doc. No. 164.[1]

On January 20, 2017, Plaintiffs filed the instant motion for default judgment.   Doc. No. 166. In the motion, Plaintiffs seek a monetary judgment of $640,747 against All Us Marketing and a monetary judgment of $389,915 against GRR Financial and Serna, jointly and severally.   *Id.* at 22-23.   They also seek an injunction that, among other things, permanently restrains the Defaulted Defendants from participating in telemarketing.   *Id.* at 20-22.   In support of the motion, Plaintiffs submitted a proposed form of judgment.   Doc. No. 166-1.   To support their request for monetary damages, they also submitted a declaration from FTC investigator Joseph Einikis.   Doc. No. 166-2.   The motion was served on the Defaulted Defendants, but none of them filed a response. Accordingly, Plaintiffs' motion for default judgment is ripe for decision.

## II.      RELEVANT FACTS ALLEGED IN THE AMENDED COMPLAINT.

All Us Marketing is a Florida company with its principal place of business in Florida.   Doc. No. 87 ¶ 9.   It was formerly known as Payless Solutions, LLC.   *Id.*   All Us Marketing transacts or has transacted business in this district and throughout the United States.   *Id.*   GRR Financial Services is a Florida company with its principal place of business in Florida.   *Id.* ¶ 15.   GRR Financial Services transacts or has transacted business in this district and throughout the United States.   All Us Marketing and GRR Financial Services, along with five other companies—Global Marketing Enterprises Inc., Global One Financial Services LLC, Your #1 Savings LLC, Ovadaa

---

[1]  In light of the repeated failures by the FTC and the State to file properly supported motions for default judgment, it is concerning to the undersigned that the present motion for entry of a default judgment is still deficient, as discussed in the body of this Report and Recommendation.   But for the trial term on which the case is set, I would have recommended that the current motion also be denied as to those issues that are not properly briefed or supported by evidence.

LLC, and Royal Holdings of America LLC[2] (these seven companies are collectively referred to as the "Payless Solutions Corporate Defendants")—operated a common enterprise while engaging in the deceptive and unfair acts and practices and other violations of law described below. *Id.* ¶ 27. The Payless Solutions Corporate Defendants conducted the business practices described below through an interrelated network of companies that have common ownership, business functions, employees, and office locations, and that have comingled funds and have shared one another's marketing materials. *Id.* Because the Payless Solutions Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices described below. *Id.*

Christian Serna is an owner or manager of GRR Financial Services. *Id.* ¶ 25. At all times material to this action, acting alone or in concert with others, and through the Payless Solutions Corporate Defendants, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices described below. *Id.* Serna is responsible for organizing and creating GRR Financial Services, establishing and maintaining merchant processing accounts, and providing order fulfillment services. *Id.* Serna also—along with Gary Rodriguez, Marbel Rodriguez, Carmen Williams, Jonathan Paulino, Fariborz Fard, Shirin Imani, and Alex Serna (collectively, these eight individuals are referred to as the "Payless Solutions Individual Defendants"; the Payless Solutions Corporate Defendants and the Payless Solutions Individual Defendants are collectively referred to as the "Payless Solutions Defendants")[3]—has formulated, directed, controlled had the authority to control, or participated in the acts and practices of the

---

[2] These five companies have all been named as Defendants in this case. Doc. No. 87. They have now all had stipulated final judgments entered against them. Doc. Nos. 133-136, 154.

[3] All of these individuals were named as Defendants in the amended complaint. Doc. No. 87. They have all had stipulated judgments entered against them. Doc. Nos. 131, 133-136, 154.

Payless Solutions Corporate Defendants that constitute the common enterprise described above. *Id.* ¶ 27. Serna resides in this district and, in connection with the matters described in Plaintiffs' amended complaint, transacts or has transacted business in this district and throughout the United States. *Id.* ¶ 25.

At all times, Defendants[4] have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Fla. Stat. § 501.203(8). *Id.* ¶ 29.

Since at least August 2011, the Payless Solutions Defendants have offered credit card interest rate reduction services to consumers throughout the United States through a telemarketing business. *Id.* ¶ 30. From at least March 2013 through November 2014, the Auto Guardian Defendants fulfilled customer orders, processed customer payments, and performed customer service functions on behalf of the Payless Solutions Defendants. *Id.*

In many instances, Defendants' telemarketing calls are initiated using a telemarketing service that delivers prerecorded voice messages—known as "voice broadcasting" or "robocalling." *Id.* ¶ 31. The prerecorded messages, which often state that they are from "Card Services" or a similarly generic business name, offer consumers the purported opportunity to secure substantially lower credit card interest rates. *Id.* The messages instruct consumers to press a number on their phones to be connected to a live representative. *Id.* When consumers press the number, they are connected to a live representative who works for the Payless Solutions Defendants. *Id.*

---

[4] As used in this Report and Recommendation, "Defendants" refers to all Defendants in this case—that is, the Payless Solutions Defendants and Auto Guardian USA, LLC; Premier Marketing International, LLC; and Kimberly M. Coarse (Auto Guardian USA, LLC; Premier Marketing International, LLC; and Coarse are referred to as the "Auto Guardian Defendants"). *See* Doc. No. 87. These additional Defendants have all had stipulated judgments entered against them. Doc. No. 132.

During telemarketing calls, the Payless Solutions Defendants often identify themselves as representatives of consumers' banks or credit card companies. *Id.* ¶ 32. Alternatively, they claim to represent "Card Services" or some other generic business name designed to mislead consumers into believing that the Payless Solutions Defendants are affiliated with the consumers' banks or credit card companies. *Id.* For example, when consumers ask whether they are speaking to a representative of their credit card company, the Payless Solutions Defendants' script instructs telemarketers to provide the following response: "We are consumer card services; we service all 551 nationwide banks and lending institutions on their Visa, MasterCard, American Express, and Discover accounts. You were referred here by your lenders due to your excellent payment history." *Id.* In truth, the Payless Solutions Defendants are not representatives of, or otherwise affiliated with, consumers' banks or credit card companies. *Id.* ¶ 49.

Defendants claim to have the ability to reduce substantially consumers' credit card interest rates. *Id.* ¶ 33. In many instances, Defendants claim that they can obtain interest rates as low as 0% for consumers. *Id.* Defendants also often claim that their interest rate reduction services will provide substantial savings to consumers (typically at least $2,500) in a short period of time and will enable them to pay off their debt much faster (typically three- to five-times faster) without increasing their monthly payments. *Id.* These representations are false and or not substantiated at the time they are made. *Id.* ¶ 46.

Defendants obtain information from consumers regarding their credit card accounts along with other personal information such as Social Security numbers. *Id.* ¶ 34. Defendants usually charge consumers' credit cards immediately following the telemarketing calls. *Id.* Defendants charge consumers a fee ranging from $300 to $3,499 for their credit card interest rate reduction services. *Id.* On calls, Defendants represent that the amount of the fee will be quickly offset by

savings achieved through reduced interest rates. *Id.* Defendants often attempt to hide the existence of this fee by claiming that they "make [their] money from the interest and finance charges we save you . . . so there's no out of pocket expense to you." *Id.*

In some instances, Defendants use consumers' personal information to apply for new credit cards on consumers' behalf, presumably with a low introductory interest rate for balance transfers. *Id.* ¶ 35. Defendants apply for these new credit cards without consumers' knowledge or consent. *Id.* In other instances, Defendants send consumers a package of financial education materials that consumers did not request or agree to pay for and that does nothing to help substantially reduce consumers' credit card interest rates. *Id.*

In most instances, Defendants fail to provide consumers with the significant reductions in credit card interest rates and minimum savings that were promised during the initial telephone call. *Id.* ¶ 36. They typically fail to provide any reduction in consumers' credit card interest rates, or any savings at all. *Id.* Consequently, consumers are not able to pay their credit card debts faster than they could have without Defendants' service. *Id.*

In numerous instances, Defendants used consumers' personal financial information to make unauthorized charges to consumers' credit cards of as much as $3,499. *Id.* ¶ 38. Some consumers recall discovering such charges shortly after providing Defendants with their credit card information, but not the authorization to charge their account. *Id.* In other instances, Defendants charge the credit cards of consumers with whom they have had no prior contact. *Id.* In each case, the consumers whose credit cards have been charged never agreed to purchase anything from Defendants. *Id.* Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. *Id.* ¶ 52.

While offering their credit card interest rate reduction services via telemarketing, the Payless Solutions Defendants—acting directly or through one or more intermediaries—have made numerous calls to telephone numbers on the National Do Not Call Registry, as well as to consumers who have previously asked Defendants not to call them again. *Id.* ¶ 39. In some instances, the Payless Solutions Defendants or their telemarketers also "spoof" their calls by transmitting false Caller Identification information so that call recipients do not know the source of the calls. *Id.*

In numerous instances, the Payless Solutions Defendants—acting directly or through one or more intermediaries—have initiated telemarketing calls that failed to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call the following: the identity of the seller; that the purpose of the call is to sell goods or services; or the nature of the goods or services. *Id.* ¶ 40. In numerous instances, the Payless Solutions Defendants, acting directly or through one or more intermediaries, have initiated prerecorded telemarketing calls to consumers that failed to promptly make such disclosures, or to immediately thereafter disclose the mechanism for asserting a Do Not Call request. *Id.*

In multiple instances, the Payless Solutions Defendants—acting directly or through one or more intermediaries—made outbound prerecorded calls that delivered messages to induce the sale of goods or services when the persons to whom these telephone calls were made had not expressly agreed, in writing, to authorize the seller to place prerecorded calls to such persons. *Id.* ¶ 41. In numerous instances, in the course of telemarketing debt relief services, Defendants have requested or received payment of a fee or consideration for a debt relief service before (a) they have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and (b) the customer has made at least one payment. *Id.* ¶ 76.

The actions described above constitute violations of the FTC Act, including 15 U.S.C. § 45(a) and (n).  *Id.* ¶¶ 42-53.  They also constitute violations of multiple provisions of the Telemarketing Sales Rule.  *Id.* ¶¶ 54-86.  In addition, they constitute violations of FDUTPA.  *Id.* ¶¶ 87-90.  With respect to the FDUTPA violations, consumers within the State of Florida and elsewhere were actually misled by Defendants' misrepresentations.  *Id.* ¶ 90.

Finally, consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the Telemarketing Sales Rule, and FDUTPA.  *Id.* ¶ 91. Defendants have been unjustly enriched as a result of their unlawful acts or practices.  *Id.*  Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.  *Id.*

## III.    APPLICABLE LAW.

In general, a court may enter a default judgment when the factual allegations of the complaint, which are assumed to be true, provide a sufficient legal basis for such entry.  *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.").   Thus, to support an entry of default judgment, "[a] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).

"Although a defaulted defendant admits well-pleaded allegations of liability, allegations relating to the amount of damages are not admitted by virtue of default.   Rather, the Court determines the amount and character of damages to be awarded."  *Miller v. Paradise of Port Richey, Inc.*, 75 F. Supp. 2d 1342, 1346 (M.D. Fla. 1999).   If a default judgment is warranted, the

court may hold a hearing for the purpose of assessing damages. Fed. R. Civ. P. 55(b)(2). *See also SEC v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005). However, a hearing is not necessary if a party submits sufficient evidence to support the request for damages. *Id*.

Finally, the Servicemembers Civil Relief Act ("SCRA") imposes an additional requirement for the entry of default judgment in "any civil action . . . in which the defendant does not make an appearance." 50 U.S.C. § 3931(a). Specifically, the SCRA provides that the court, "before entering judgment for the plaintiff, shall require the plaintiff to file with the court an affidavit—(A) stating whether or not the defendant is in military service and showing necessary facts to support the affidavit; or (B) if the plaintiff is unable to determine whether or not the defendant is in military service, stating that the plaintiff is unable to determine whether or not the defendant is in military service." 50 U.S.C. § 3931(b)(1).

## IV. ANALYSIS.

### A. *Compliance with SCRA.*

Before turning to liability, I address one preliminary issue. As noted above, the SCRA forbids a court from entering a default judgment against an individual defendant who has not appeared unless the plaintiff files an affidavit stating whether or not the defendant is in the military service or files an affidavit stating that the plaintiff is unable to determine whether or not the defendant is in the military service. 50 U.S.C. § 3931(b)(1). Plaintiffs have not complied with this requirement as to Serna,[5] which alone would justify denying the motion for default judgment without prejudice. *See, e.g.*, *Hall v. Colicchio*, No. 6:14-cv-1467-Orl-31TBS, 2015 WL 3866099, at *3 (M.D. Fla. June 22, 2015) (noting that default judgment should not be entered against

---

[5] Information about a defendant's military status is often included in the affidavit of service, but none of the documents proving service provides such information about Serna. *See* Doc. Nos. 99, 122, 158-1.

individual defendant because plaintiff had not complied with SCRA).  Because this deficiency could be cured by filing an affidavit prior to the entry of judgment, however, I address the merits of Plaintiffs' renewed motion for default judgment against Serna.

*B.  Liability.*

A default judgment is appropriate "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend" itself in a lawsuit.  Fed. R. Civ. P. 55(a).  The Defaulted Defendants failed to participate in the case, despite the fact that they were provided with notice of it.  Therefore, so long as Plaintiffs' factual allegations support each element of their claims, a default judgment is appropriate.  I discuss each of Plaintiffs' claims separately, below.  I then discuss the basis for holding Serna individually liable.

1. Claims Against All US Marketing and GRR Financial.[6]

a.  *Violations of Section 5(a) of the FTC Act.*

i.  Misrepresenting Material Facts (Counts One and Two).

The FTC seeks an entry of default judgment against All Us Marketing and GRR Financial for violations of Section 5(a) of the FTC Act because they made false statements about their credit card interest rate reduction services (Count One) and falsely represented that they were affiliated with consumers' banks or credit card companies (Count Two).

---

[6] In the amended complaint, all of these claims were also lodged against the other Payless Solutions Corporate Defendants and some were lodged against all Defendants.  By their default, All Us Marketing and GRR Financial have admitted that the Payless Corporate Defendants conducted their business through an interrelated network of companies that have common ownership, business functions, employees, and office locations, and that have comingled funds and have shared one another's marketing materials.  Doc. No. 87 ¶ 27.  Thus, they have admitted that the Payless Solutions Corporate Defendants operated as a "common enterprise," which justifies ignoring corporateness and treating an act by one entity as an act by each entity comprising the "common enterprise." *See FTC v. Washington Data Res.*, 856 F. Supp. 2d 1247, 1271-72 (M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013) (citations omitted) (explaining standard for finding a "common enterprise").  In addition, by admitting allegations that describe the actions of the Payless Solutions Defendants as a group and the actions of all Defendants as a group, they have admitted that they engaged in all the acts attributed to them in this section of the Report and Recommendation.

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). By their default, All Us Marketing and GRR Financial have admitted that they offered credit card interest rate reduction services by telemarketing through interstate telephone calls to consumers throughout the United States. *See, e.g.*, Doc. No. 87 ¶¶ 29-31. This is sufficient to establish that they engaged in acts or practices affecting commerce.

To establish that an act or practice violates Section 5(a), the FTC must establish that: (1) there was a representation; (2) the representation was likely to mislead consumers acting reasonably under the circumstances; and (3) the misrepresentation was material. *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003) (citations omitted). A representation is material if it is of a kind usually relied upon by a reasonably prudent person. In addition, express false claims used to induce the purchase of a particular product or service are presumed to be material. *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999) (citations omitted).

By their default, All Us Marketing and GRR Financial admit that they made the following representations to consumers in connection with the advertising, marketing, promotion, offering for sale, or sale of credit card interest rate reduction services: (1) consumers who purchase Defendants' credit card interest rate reduction services generally will have their credit card interest rates reduced substantially; (2) consumers who purchase Defendants' credit card interest rate reduction services generally will save thousands of dollars in a short time as a result of lowered credit card interest rates; (3) consumers who purchase Defendants' credit card interest rate reduction services generally will be able to pay off their debts much faster (typically three- to five-times faster), as a result of lowered credit card interest rates; and (4) the Payless Solutions Defendants are representatives of, or otherwise affiliated with, consumers' banks or credit card companies. Doc. No. 87 ¶¶ 32-34, 45, 48. They have also admitted that those representations were false. *Id.* ¶¶ 36, 46, 49. Such

representations were likely to mislead consumers acting reasonably under the circumstances. Because the representations were false, they are also presumed to be material. Accordingly, the FTC has established that All Us Marketing and GRR Financial are liable for violations of Section 5(a) of the FTC Act based on the false and misleading representations they made. *See, e.g.*, *FTC v. JPM Accelerated Servs., Inc.*, No. 6:09-cv-2012-Orl-28KRS, 2011 WL 679938, at *2-3 (M.D. Fla. Jan. 25, 2011), *report and recommendation adopted by* 2011 WL 675400 (M.D. Fla. Feb. 16, 2011).

ii.     Unauthorized Charging Practices (Count Three).

The FTC also seeks a default judgment against All Us Marketing and GRR Financial because they violated Section 5(a) of the FTC Act by causing the billing information of consumers to be submitted for payment without consumers' express informed consent. As mentioned above, Section 5(a) prohibits unfair methods of competition in or affecting commerce. Under Section 5(a), an act or practice is unfair if it (1) causes or is likely to cause substantial injury to consumers (2) that is not reasonably avoidable and (3) is not outweighed by countervailing benefits to consumers or competition. *See* 15 U.S.C. § 45(n); *FTC v. Global Mktg. Grp.*, 594 F. Supp. 2d 1281, 1288 (M.D. Fla. 2008) (citation omitted). Courts have found that billing consumers for services they did not expressly authorize constitutes an unfair act or practice. *See id.* at 1288-89; *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1003-05 (N.D. Cal. 2010), *aff'd*, 475 F. App'x 106 (9th Cir. 2012).

By their default, All Us Marketing and GRR Financial have admitted that they used consumers' personal financial information to make unauthorized charges to consumers' credit cards of as much as $3,499. *See, e.g.*, Doc. No. 87 ¶ 38. Given the substantial amounts charged to consumers' credit cards, the practice caused substantial injury to consumers. The substantial injury was not outweighed by countervailing benefits to consumers or competition because consumers

almost never received the credit card interest rate reductions that were promised.   *Id.* ¶ 36; *see also Global Mktg. Grp.*, 594 F. Supp. at 1289.   Finally, consumers could not reasonably have avoided their injuries because they had no reason to anticipate the impending harm and the means to avoid it.   Indeed, All Us Marketing and GRR Financial have admitted that they sometimes charged the credit cards of consumers with whom they had no prior contact.   Doc. No. 87 ¶ 38; *see Global Mktg. Grp.*, 594 F. Supp. at 1289 (consumers could not reasonably avoid injuries where defendant withdrew funds from consumers' bank accounts without permission).   Accordingly, the FTC has established that All Us Marketing and GRR Financial are liable for violations of Section 5(a) of the FTC Act based on their unauthorized charging of consumers' credit cards.

> b.     *Violations of the Telemarketing Sales Rule.*

Both the FTC and the State allege that All Us Marketing and GRR Financial violated several sections of the Telemarketing Sales Rule, 16 C.F.R. Part 310, which prohibits "sellers" or "telemarketers" from engaging in deceptive or abusive telemarketing practices.   The FTC promulgated the Telemarketing Sales Rule to implement the Telemarketing Act.   The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the Telemarketing Sales Rule and to secure equitable relief.   See 15 U.S.C. §§ 53(b), 56(a)(2)(A)-(B), 57b, 6102(c), 6105(b).   The Telemarketing Act also provides, in relevant part:

> Whenever an attorney general of any State has reason to believe that the interests of ***the residents of that State*** have been or are being threatened or adversely affected because any person has engaged or is engaging in a pattern or practice of telemarketing which violates any rule of the Commission under section 6102 of this title [which includes the TSR], the State, as parens patriae, may bring a civil action ***on behalf of its residents*** in an appropriate district court of the United States to enjoin such telemarketing, to enforce compliance with such rule of the Commission, to obtain damages, restitution, or other compensation ***on behalf of residents of such State***, or to obtain such further and other relief as the court may deem appropriate.

15 U.S.C. § 6103(a) (emphasis added). Under the statute, the State can bring an action for violations of the TSR only on behalf of residents of Florida. The amended complaint alleges that Defendants' actions actually misled consumers within the State of Florida. Doc. No. 87 ¶ 90. This is sufficient to show that the State has reason to believe that the interests of the residents of the State have been or are being threatened or adversely affected. Thus, the State may proceed on its claim of violations of the TSR along with the FTC.

The FTC and the State allege that All Us Marketing and GRR Financial have violated several provisions of the Telemarketing Sales Rule. I discuss each provision, below.

      i.      Violations of 16 C.F.R. § 310.3(a) (Counts Four and Five).

16 C.F.R. § 310.3(a) provides, in relevant part:

> It is a deceptive telemarketing act or practice and a violation of this Rule for any seller or telemarketer to engage in the following conduct:
>
>       ***
>
> (2)    Misrepresenting, directly or by implication, in the sale of goods or services any of the following material information:
>
>       ***
>
> (vii)   A seller's or telemarketer's affiliation with, or endorsement or sponsorship by, any person or government entity.
>
>       ***
>
> (x)    Any material aspect of any debt relief service, including but not limited to, the amount of money or the percentage of the debt that a customer may save by using such service; [and] the amount of time necessary to achieve the represented results . . . .

The Telemarketing Sales Rule defines "telemarketing" to mean "a plan, program, or campaign which is conducted to induce the purchase of goods or services . . . , by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg). It defines

"telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer . . . ." 16 C.F.R. § 310.3(ff).  "Person," in turn, means "any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity."  16 C.F.R. § 310.2(y). "Debt relief service" means "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector."  16 C.F.R. § 310.2(o).

By their default, All Us Marketing and GRR Financial have admitted that they made numerous interstate telephone calls to induce the purchase of credit card interest rate reduction services throughout the United States.  *See, e.g.*, Doc. No. 87 ¶¶ 30, 34.  This is sufficient to establish that they are "telemarketers" within the meaning of the Telemarketing Sales Rule.  *See also id.* ¶ 56 (Defendants are "telemarketers" within the meaning of the Telemarketing Sales Rule). They have also admitted that they marketed credit card interest rate reduction services.  *See, e.g.*, *id.* ¶¶ 30, 33, 36.  This is sufficient to establish that their credit card interest rate reduction service was a "debt relief service" within the meaning of the Telemarketing Sales Rule.

Regarding the substance of the alleged violations of the Telemarketing Sales Rule, All Us Marketing and GRR Financial have admitted that they falsely suggested to consumers that they were affiliated with consumers' credit card companies or banks.  *See id.* ¶¶ 32, 48, 49, 74.  This is sufficient to establish that they are liable to the FTC and the State for violating 16 C.F.R. § 310.3(a)(vii) (Count Five).  All Us Marketing and GRR Financial have admitted that they made false statements to consumers, including misrepresentations about the amount of money a customer might save by using their credit card interest rate reduction service and the amount of time necessary

to achieve the represented results.  *See id.* ¶¶ 33, 36, 72.  This is sufficient to establish that they

are liable to the FTC and the State for violating 16 C.F.R. § 310.3(a)(x) (Count Four).

           ii.      Violations of 16 C.F.R. § 310.4(a) (Counts Six, Seven, and Ten).

16 C.F.R. § 310.4(a) provides, in relevant part:

> It is an abusive telemarketing act or practice and a violation of this Rule for any seller
> or telemarketer to engage in the following conduct:
>
>                      ***
>
> (5) (i)  Requesting or receiving payment of any fee or consideration for any
>         debt relief service until and unless:
>
>       (A)    The seller or telemarketer has renegotiated, settled, reduced,
>            or otherwise altered the terms of at least one debt pursuant to
>            a settlement agreement, debt management plan, or other such
>            valid contractual agreement executed by the customer; [and]
>
>       (B)    The customer has made at least one payment pursuant to that
>            settlement agreement, debt management plan, or other valid
>            contractual agreement between the customer and the creditor
>            or debt collector . . . .
>
>                      ***
>
> (7)     Causing billing information to be submitted for payment, directly or
>         indirectly, without the express informed consent of the customer or
>         donor.  In any telemarketing transaction, the seller or telemarketer
>         must obtain the express informed consent of the customer or donor to
>         be charged for the goods or services . . . and to be charged using the
>         identified account.
>
>                      ***
>
> (8)     Failing to transmit or cause to be transmitted the telephone number,
>         and, when made available by the telemarketer's carrier, the name of
>         the telemarketer, to any caller identification service in use by a
>         recipient of a telemarketing call . . . .

As explained above, All Us Marketing and GRR Financial have admitted that they are

"telemarketers" within the meaning of the Telemarketing Sales Rule and that their credit card

interest reduction service was a "debt relief service" within the meaning of the Telemarketing Sales

Rule. Regarding the substance of the alleged violations, they have admitted that they charged consumers' credit cards a fee ranging from $300 to $3,499 immediately following telemarketing calls and before any service had been provided. Doc. No. 87 ¶ 34. This is sufficient to establish that they are liable to the FTC and the State for violating 16 C.F.R. § 310.4(a)(5)(i) (Count Six). They have also admitted that they made unauthorized charges on consumers' credit cards of up to $3,499. *Id.* ¶ 38. This is sufficient to establish that they are liable to the FTC and the State for violating 16 C.F.R. § 310.4(a)(7) (Count Seven). Finally, All Us Marketing and GRR Financial have admitted that they "spoofed" their telemarketing calls by transmitting false caller identification information so that call recipients did not know the source of the calls. Doc. No. 87 ¶ 39. This is sufficient to establish that they are liable to the FTC and the State of Florida for violating 16 C.F.R. § 310.4(a)(8) (Count Ten).

   iii. Violations of 16 C.F.R. § 310.4(b) and (d) (Counts Eight, Nine, Eleven, and Twelve).

16 C.F.R. § 310.4(b) provides, in pertinent part, as follows:

(1) It is an abusive telemarketing act or practice and a violation of this Rule to engage in, or for a seller to cause a telemarketer to engage in, the following conduct:

***

  (iii) Initiating any outbound telephone call to a person when:

    (A) That person has previously stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered . . .; or

    (B) That person's telephone number is on the "do-not-call" registry, maintained by the [FTC], of persons who do not wish to receive outbound telephone calls to induce the purchase of goods or services unless the seller or telemarketer:

      (1) Can demonstrate that the seller has obtained the express agreement, in writing, of such person to place calls to that person . . .; or

- 18 -

(2) Can demonstrate that the seller has an established business relationship with such person, and that person has not stated that he or she does not wish to receive outbound telephone calls under paragraph (b)(1)(iii)A) of this section . . . .

\*\*\*

(v) Initiating any outbound telephone call that delivers a prerecorded message, other than a prerecorded message permitted for compliance with the call abandonment safe harbor in § 310.4(b)(4)(iii); unless:

(A) In any such call to induce the purchase of any good or service, the seller has obtained from the recipient of the call an express agreement, in writing that:

(i) The seller obtained only after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person;

(ii) The seller obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service;

(iii) Evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller; and

(iv) Includes such person's telephone number and signature; and

(B) In any such call to induce the purchase of any good or service . . . , the seller or telemarketer:

\*\*\*

(ii) Within two (2) seconds after the completed greeting of the person called, plays a prerecorded message that promptly provides the disclosures required by       § 310.4(d) . . . .

(4) A seller or telemarketer will not be liable for violation § 310.4(b)(1)(iv) if:

\*\*\*

(iii) Whenever a sales representative is not available to speak with the person answering the call within two (2) seconds after the person's completed

greeting, the seller or telemarketing promptly plays a recorded message that states the name and number of the seller on whose behalf the call was placed . . . .

16 C.F.R. § 310.4(d), in turn, provides, in relevant part:

It is an abusive telemarketing act or practice and a violation of this Rule for a telemarketer in an outbound telephone call or external upsell to induce the purchase of goods or services to fail to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call, the following information:

(1) The identity of the seller;

(2) That the purpose of the call is to sell goods or services; [and]

(3) The nature of the goods or services . . . .

As explained above, All Us Marketing and GRR Financial have admitted that they are "telemarketers" within the meaning of the Telemarketing Sales Rule. Regarding the substance of the alleged violations, they have admitted that they initiated outbound telephone calls to consumers who had previously asked Defendants not to call them again. Doc. No. 87 ¶¶ 39, 81. This is sufficient to establish that they are liable to the FTC and the State for violation 16 C.F.R.                § 310.4(b)(1)(iii)(A) (Count Nine). All Us Marketing and GRR Financial have also admitted that they initiated telemarketing calls using prerecorded messages that offered consumers the opportunity to secure substantially lower credit card interest rates and that the recipients of the calls had not signed an express agreement, in writing, authorizing them to place prerecorded calls to the recipients. *Id.* ¶¶ 31, 83. The content of these prerecorded messages goes beyond the call abandonment safe harbor set forth in 16 C.F.R. § 310.4(b)(4)(iii). Therefore, the allegations are sufficient to establish that they are liable for violating 16 C.F.R. § 310.4(b)(1)(v)(A) (Count Eleven). Finally, All Us Marketing and GRR Financial have admitted that they initiated outbound telemarketing calls that delivered a prerecorded message but failed to disclose truthfully, promptly, and in a clear and conspicuous manner, the identity of the seller of services, that the purpose of the

call is to sell goods or services, and the nature of the goods or services.  *Id.* ¶¶ 40, 85.  This is sufficient to establish that they are liable to the FTC and the State for violating 16 C.F.R. § 310.4(b)(1)(v)(B)(ii) and (d) (Count Twelve).

However, the amended complaint does not appear to adequately state a claim for violating 16 C.F.R. § 310.4(b)(1)(iii)(B) based on Defendants' calls to telephone numbers on the National Do Not Call Registry.  Here, All Us Marketing and GRR Financial have admitted only that they initiated outbound telephone calls to telephone numbers on the National Do Not Call Registry.  *Id.* ¶¶ 39, 80.  The Telemarketing Sales Rule does not, however, make calls to numbers on the National Do Not Call Registry a *per se* violation.  Rather, such calls only violate the rule if they are made without the express written consent of the person or an established business relationship with the person.  16 C.F.R. 310.4(b)(1)(iii)(B).  The amended complaint does not include allegations showing that any calls made to numbers on the National Do Not Call Registry were made without express written consent or an established business relationship with the person.  Therefore, it does not appear to state a plausible claim for violating 16 C.F.R. § 310.4(b)(1)(iii)(B), and I recommend that the Court find All Us Marketing and GRR Financial are not liable for the violations alleged in Count Eight of the amended complaint.

### c.  *Violations of FDUTPA.*

Finally, the State alleges that All Us Marketing and GRR Financial have violated FDUTPA. Section 501.204 of the Florida Statutes provides, "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."  Fla. Stat. § 501.204(1).  It goes on to provide, "It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1)

of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2006." Fla. Stat. §

501.204(2). Conduct that constitutes a "deceptive act or practice" or an "unfair act or practice"

under the FTC Act is a violation of FDUTPA. *FTC v. Alcoholism Cure Corp.*, No. 3:10-cv-266-J-

34JBT, 2011 WL 8190540, at *6-7 (M.D. Fla. Dec. 5, 2011) (citing Fla. Stat. §§ 501.202-204).

Section 501.207 allows the Attorney General to bring an action to enforce FDUTPA. As explained

above, the amended complaint adequately alleges that All Us Marketing and GRR Financial

engaged in unfair acts or practices that violate the FTC Act. Accordingly, they are also liable to

the State for violations of FDUTPA.[7]

### 2. Claims Against Serna.

Plaintiffs argue that Serna should be held individually liable for all of the claims in the

amended complaint.[8] As to the claims under the FTC Act and the Telemarketing Sales Rule, once

corporate liability has been established, an individual defendant may also be held individually liable

---

[7] The amended complaint alleges that Defendants' misrepresentations actually misled consumers within the State of Florida. Doc. No. 87 ¶ 90. This provides a nexus between the State of Florida and acts that allegedly violate FDUTPA. That said, the amended complaint also appears to be seeking recovery under FDUTPA on a nationwide basis. *See id.* (emphasis added) ("Defendants' representations . . . are false and misleading and likely to mislead consumers acting reasonably, and consumers within the State of Florida *and elsewhere* were actually misled by Defendants' misrepresentations . . . . "). The law in Florida on FDUTPA's applicability to out-of-state consumers is somewhat unclear. *See FTC v. Information Mgmt. Forum, Inc.*, No. 6:12-cv-986-Orl-28KRS, 2013 WL 3323635, at *6 (M.D. Fla. June 28, 2013) (collecting cases). Nonetheless, I recommend that the Court find that the rationale of *Millennium Communications & Fulfillment, Inc. v. Office of the Attorney General*, 761 So. 2d 1256, 1261 (Fla. 3d Dist. Ct. App. 2000), is applicable to this case because, just as in that case, the amended complaint alleges that Defendants—all of which are Florida corporations or limited liability companies—directed false and misleading telephone communications from Florida to consumers around the country. Thus, as in that case, I recommend that the Court conclude that the amended complaint contains sufficient allegations to establish that FDUTPA applies to the State's claims against All Us Marketing and GRR Financial. *See Information Mgmt. Forum, Inc.*, 2013 WL 3323635, at *7 (collecting and summarizing cases and finding that FDUTPA applied even though the complaint did not allege that Florida residents were affected by the defendant's conduct).

[8] Plaintiffs' motion for default judgment only provides authority for holding Serna individually liable under the FTC Act. It does not address FDUTPA. However, the amended complaint seeks to hold Serna individually liable for the alleged violations of FDUTPA. *See* Doc. No. 87 ¶¶ 87-90. Because of the age of this case, I *sua sponte* address whether it is appropriate to hold Serna liable for violations of FDUTPA.

for such violations if he participated directly in the deceptive practices or acts or possessed the authority to control them. In addition, Plaintiffs must establish that the individual had some knowledge of the practices. *FTC v. USA Fin., LLC*, 415 F. App'x 970, 974 (11th Cir. 2011) (cited as persuasive authority) (citing *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996)).

By his default, Serna has admitted that the Payless Solutions Corporate Defendants conducted the business practices described in the amended complaint through an interrelated network of companies that have common ownership, business functions, employees, and office locations, and that have commingled funds and have shared one another's marketing materials. Doc. No. 87 ¶ 27. Thus, he has admitted that the Payless Solutions Corporate Defendants operated as a "common enterprise," which justifies ignoring corporateness and treating an act by one entity as an act by each entity comprising the "common enterprise." *See Washington Data Res.*, 856 F. Supp. 2d at 1271-72 (citations omitted) (explaining standard for finding a "common enterprise"). He has also admitted that he was an owner or manager of GRR Financial Services (one of the entities comprising the common enterprise). Doc. No. 87 ¶ 25. He has admitted that he formulated, directed, had the authority to control, or participated in the acts and practices set forth in the amended complaint. *Id.* In addition, Serna has admitted his participation in—and thus his knowledge of—the Payless Solutions Defendants' improper telemarketing activities by his admission of the allegations of the amended complaint that describe the conduct of the Payless Solutions Defendants as a group and the conduct of all Defendants as a group. *See, e.g.*, *id.* ¶¶ 33, 38 ("Defendants claim to have the ability to reduce substantially consumers' credit card interest rates . . . . In numerous instances, Defendants use consumers' personal financial information to make unauthorized charges to consumers' credit cards of as much as $3499."). This is sufficient to establish Serna's individual

liability to the FTC and the State for violations of Section 5 of the FTC Act and the Telemarketing Sales Rule.

Serna is also individually liable to the State for violations of FDUTPA. To proceed against an individual for a violation of FDUTPA, a plaintiff must allege that the individual was a direct participant in the dealings. *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1074 (Fla. 5th Dist. Ct. App. 2008) (collecting cases). As mentioned above, by his default, Serna has admitted his participation in the Payless Solutions Defendants' improper telemarketing activities by his admission of the allegations of the complaint that describe the conduct of the Payless Solutions Defendants as a group and the conduct of all Defendants as a group. This is sufficient to establish Serna's individual liability for violations of FDUTPA.

*C. Remedies.*

1. Permanent Injunction.

Plaintiffs seek the entry of a permanent injunction and money judgments against All Us Marketing, GRR Financial, and Serna. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides: "[I]n proper cases, the [FTC] may seek, and after proper proof, the court may issue, a permanent injunction." While the provision's text refers only to injunctive relief, courts agree that it provides an "unqualified grant of statutory authority" to issue "the full range of equitable remedies," including "the power to grant consumer redress and compel disgorgement of profits." *Gem Merch. Corp.*, 87 F.3d at 468. Similarly, FDUTPA provides that the State may bring an action seeking to "enjoin any person who has violated, is violating, or is otherwise likely to violate" FDUTPA, and that courts may "make appropriate orders, including but not limited to . . . grant[ing] legal, equitable, or other appropriate relief . . . . " Fla. Stat. § 501.207(1)(b) and (3).[9]

---

[9] The remedies discussed in this Report and Recommendation are equally applicable to the Defaulted Defendants' violations of the FTC Act and FDUTPA. FDUTPA is modeled after the FTC Act and looks to

Permanent injunctive relief is appropriate when "'the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.'" *FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1335 (M.D. Fla. 2010) (quoting *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir. 1980)). To determine the likelihood of future violations, courts consider "'the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.'" *Id.* (quoting *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982)).

By their default, the Defaulted Defendants have admitted that consumers will continue to suffer substantial injury as a result of their violations of the law. Doc. No. 87 ¶ 91. They have admitted that, absent injunctive relief, they are likely to continue to injure consumers and harm the public interest. *Id.* They also have admitted to participating in an elaborate scheme involving multiple interrelated companies whereby they repeatedly charged consumers substantial amounts of money (up to $3,499) without authorization for non-existent credit card interest rate reduction services. Moreover, the Court has already determined that permanent injunctive relief is appropriate as to the non-Defaulted Defendants, *see* Doc. Nos. 131-136, 154, and the Defaulted

interpretations of the FTC Act for guidance in determining "unfair or deceptive acts or practices." Fla. Stat. §§ 501.204(1) and (2). In addition, Fla. Stat. § 501.207 sets forth the remedies available to the State's enforcing authority under FDUTPA—that is, the Attorney General. It provides that, in a suit brought under FDUTPA by the State, a court may, upon motion by the State, "make appropriate orders . . . to reimburse consumers or governmental entities found to have been damaged; . . . to impose reasonable restrictions upon the future activities of any defendant to impede him or her from engaging in or establishing the same type of endeavor; . . . or to grant legal, equitable, or other appropriate relief." Fla. Stat. § 501.207(3). *See also Alcoholism Cure Corp.*, 2012 WL 12903173, at *1 & n. 1 (citations omitted) (finding that remedies under Section 13(b) are equally applicable to violations of the FTC Act and FDUTPA; entering permanent injunction and awarding monetary judgment to FTC and the State of Florida in a case where defendants were found to have violated both the FTC Act and FDUTPA).

Defendants have not objected to the entry of a permanent injunction against them. Therefore, I recommend that the Court find that a permanent injunction is appropriate in this case and enter a permanent injunction against All Us Marketing, GRR Financial, and Serna in a form acceptable to the Court.[10]

2. Equitable Monetary Awards.

Plaintiffs also seek imposition of money judgments against each Defaulted Defendant in the amount of the consumer injury caused by the Defaulted Defendants' unlawful business practices.[11] The Court has the equitable authority under the FTC Act to order monetary relief. *See McGregor v. Chierico*, 206 F.3d 1378, 1388-89 (11th Cir. 2000); *Gem Merch. Corp.*, 87 F.3d at 469-70. The Eleventh Circuit has determined that the appropriate measure of such relief is a defendant's unjust enrichment or net revenue, which can be measured by the amounts previously paid by consumers less any amount returned to consumers. *Washington Data Res., Inc.*, 704 F.3d at 1326. To support such an award of equitable monetary relief, a plaintiff "must show that its calculations reasonably approximated the amount of customers' net losses . . . ." *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir. 1997). After it makes that showing, the burden shifts to the defendant to show any inaccuracies in the plaintiff's figures. *Id.* Defendants acting as a common enterprise are jointly and severally liable for the amount of equitable monetary relief. *Gem Merch. Corp.*, 87 F.3d at 468 (when "each

---

[10] Plaintiffs have submitted a proposed judgment, which includes proposed permanent injunction language. Doc. No. 166-1. All of the terms of the proposed permanent injunction are consistent with the stipulated permanent injunctions already entered against the other Defendants in this case. *See, e.g.*, Doc. No. 136. They are also similar to the terms of permanent injunctions that have been issued following default judgments in similar cases. *See, e.g.*, *FTC v. Information Mgmt. Forum, Inc.*, No. 6:12-cv-986-Orl-28KRS, Doc. No. 51 (M.D. Fla. Aug. 30, 2013); *FTC v. JPM Accelerated Servs., Inc.*, No. 6:09-cv-2021-28KRS, Doc. No. 98 (M.D. Fla. Feb. 16, 2011); *see also* Doc. No. 166, at 20-22 & n. 65 (citing multiple cases that have entered final judgments including similar terms). In addition, the Defaulted Defendants have not objected to the form of the proposed judgment. Thus, it appears that it would be appropriate for the Court to enter a final judgment in the form proposed by Plaintiffs, if it finds such terms to be acceptable.

[11] In the amended complaint, the State also sought the imposition of civil penalties. Because it has not renewed that request in the motion for default judgment, I consider it to be abandoned.

defendant repeatedly participated in the wrongful acts and each defendant's acts materially contributed to the losses suffered, all defendants [may be] held jointly and severally liable").

Here, Plaintiffs seek a monetary judgment of $640,747 against All Us Marketing. To support this award, Plaintiffs have submitted a declaration from FTC Investigator Joseph F. Einikis. Doc. No. 166-2. In his declaration Einikis avers that, in connection with this case, FTC staff obtained and reviewed voluminous records relating to Defendants' operations and finances, including records recovered from Defendants' offices, various banks and payment processing entities, other law enforcement agencies, former employees, and consumers. *Id.* ¶ 4. Review of those records shows that All Us Marketing was formed in April 2014 (it was originally known as Payless Solutions LLC and changed its name to All Us Marketing LLC in October 2014). *Id.* ¶¶ 5, 9(e). The last date for which accurate financial records exist showing the funds Defendants obtained from consumers is August 2014. *Id.* ¶ 10 (citing Doc. No. 21-1). The FTC's analysis of those records shows that, between April 2014 and August 2014, accounts owned or controlled by Defendants received deposits totaling $640,747. *Id.* ¶ 10. Einikis does not document any refunds that were made to consumers during this time. Einikis avers that, based on this information, a fair approximation of the total harm caused by All Us Marketing during the relevant period is $640,747. *Id.* ¶ 11. This evidence reasonably calculates consumers' net losses as a result of the deceptive and unfair telemarketing practices attributed to All Us Marketing. All Us Marketing also has not objected to this monetary award. Thus, I recommend that the Court award equitable monetary relief of $640,747 against All Us Marketing.

Plaintiffs also seek a monetary judgment of $389,915 against GRR Financial Services and Serna, jointly and severally. In support of this award, Plaintiffs again rely on the declaration of Einikis. In his declaration Einikis avers that GRR Financial Services was created in June 2014.

*Id.* ¶ 13. He also avers that review of Defendants' records shows that Serna directed the activities of GRR Financial between June 2014 and August 2014. *Id.* ¶ 21. The FTC's analysis of Defendants' records shows that, between June 2014 and August 2014, a GRR Financial Services account (which was controlled by Serna) received deposits totaling $389,915 from its merchant processor, SecureSwype LLC. *Id.* ¶¶ 16, 20. Einikis does not document any refunds that were made to consumers during this time. Einikis avers that, based on this information, a fair approximation of the total harm caused by GRR Financial and Serna during the relevant period is $389,915. *Id.* ¶ 21. This evidence reasonably calculates consumers' net losses as a result of the deceptive and unfair telemarketing practices attributed to GRR Financial and Serna. GRR Financial and Serna also have not objected to this propose monetary award. Thus, I recommend that the Court award equitable monetary relief of $389,515 against GRR Financial and Serna, jointly and severally.[12]

Finally, Plaintiffs propose to limit the possibility of double recovery by providing in their proposed judgment that Plaintiffs may not collect any amounts from the Defaulted Defendants that would result in Plaintiffs recovering more than $4,890,797 in this case—the total amount of consumer injury caused by all of the violations alleged in the first amended complaint. *See, e.g.*, Doc. No. 136 ¶ VII(D) (noting that Plaintiffs and the other Defendants in this case have stipulated that $4,890,797 represents the consumer injury caused by all the violations alleged in the first amended complaint); Doc. No. 21-1 ¶ 135 (summarizing review of financial records and finding that the revenue attributable to Defendants' business practices from October 2011 through August

---

[12] As explained above, because Serna directed and controlled GRR Financial, he is individually liable for its actions. Thus, joint and several liability is appropriate. *See Alcoholism Cure Corp.*, 2012 WL 12903173, at *5 n. 7.

2014 is $4,890,797). This appears to be an appropriate limitation, and I recommend that the Court incorporate it into its final judgment.

## V. RECOMMENDATIONS.

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the Court do the following:

1. **GRANT in part and DENY in part** Plaintiffs' Second Renewed Motion for Entry of Default Judgment and Order for Permanent Injunction and Monetary Relief Against Defendants Christian Serna, All Us Marketing LLC, and GFF Financial Services LLC (Doc. No. 166);

2. **FIND** All Us Marketing, GRR Financial, and Christian Serna liable to the FTC for violations of Section 5 of the FTC Act and the Telemarketing Sales Rule, as stated in Counts One through Seven and Nine through Twelve of Plaintiffs' first amended complaint;

3. **FIND** All Us Marketing, GRR Financial, and Christian Serna liable to the State for violations of the Telemarketing Sales Rule and FDUTPA, as stated in Counts Four Seven and Nine through Thirteen of Plaintiffs' first amended complaint;

4. **DECLINE** to find All Us Marketing, GRR Financial, and Christian Serna liable to the FTC and the State for the violations of the Telemarketing Sales Rule asserted in Count Eight of Plaintiffs' first amended complaint;

5. **ENTER** a permanent injunction against All Us Marketing and GRR Financial in a form acceptable to the Court;

6. **ENTER** a permanent injunction against Christian Serna in a form acceptable to the Court, provided that Plaintiffs comply with the SCRA within the time for objecting to this Report and Recommendation;

7. **AWARD** equitable monetary relief against All Us Marketing and in favor of Plaintiffs in the amount of $640,747, provided that Plaintiffs may not collect any amounts that would result in Plaintiffs recovering more than $4,890,797 in this case;

8. **AWARD** equitable monetary relief against GRR Financial and Christian Serna, jointly and severally, in the amount of $389,915, provided that Plaintiffs may not collect any amounts that would result in Plaintiffs recovering more than $4,890,797 in this case, and provided—as to Christian Serna—that Plaintiffs comply with the SCRA within the time for objecting to this Report and Recommendation; and

9. After entry of judgment, **DIRECT** the Clerk of Court to close the file.

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on April 13, 2017.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record

Unrepresented Party
Courtroom Deputy